JMG/USAO # 2012R00650

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

2012 DEC 13  P 3: 18

CLERK'S OFFICE
AT BALTIMORE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIM NO. WDQ-12-0646 |
| | ) | |
| v. | ) | (Conspiracy to Defraud the United States, |
| | ) | 18 U.S.C. § 371; Using a Fraudulent or |
| SHAWN CHUNSIK KIM, | ) | Counterfeit Seal of a Federal Agency, 18 |
| | ) | U.S.C. § 506; Causing an Act to Be Done, |
| *Defendant.* | ) | 18 U.S.C. § 2(b)) |
| | ) | |

## INFORMATION

The United States Attorney for the District of Maryland charges:

## COUNT ONE

### (Conspiracy)

### Introduction

At all times relevant to this Information:

1. Mirage Cosmetics, Inc. (Mirage) was a subchapter S corporation, originally founded in 1991, that was in the business of manufacturing and selling its own cosmetics product lines. Mirage manufactured a number of cosmetics products, including fingernail polish, lip gloss, lipstick, and facial blush powder at its facility located on Tucker Street in Beltsville, Maryland. It had four principal product lines – "Sinful Colors," "Wild and Crazy," "freshMinerals," and "freshCover." Mirage marketed its products domestically primarily through a contract with the Walgreens drug store chain, and it also sells to Target, Costco, and other chain stores.

2. Mirage also sold its products abroad in many foreign countries: Australia, Belgium, Canada, Denmark, Estonia, France, Germany, Greece, Italy, Japan, Korea, the Netherlands, Singapore, South Korea, Spain, Switzerland, Turkey, the United Kingdom, and Vietnam. Mirage reported gross receipts to the Internal Revenue Service (IRS) of $18,278,329 in 2008 and of $16,403,862 in 2009 – although, in part for the reasons set forth below, these figures are understated. On March 17, 2011, many of the assets of Mirage were acquired by Revlon, Inc.

3. Mirage was wholly owned by **Bae Soo "Chris" Chon ("Chon")**, who was the company's President. Because Mirage is a subchapter S corporation, the net profits earned on Mirage's business operations passed through directly to **Chon**, and were required to be reported as taxable income on the joint income tax return that he filed each year with his wife.

4. Defendant **SHAWN CHUNSIK KIM** was the International Marketing and Sales Vice-President for Mirage, where he has worked since July 1997. As the International Sales Marketing and Sales Vice-President, defendant **KIM**'s responsibilities included overseeing Mirage's sales operations abroad, dealing with existing foreign distributors, making sure that requested product was shipped to foreign distributors in a timely manner, and that the company's foreign distributors paid the amounts they owed to the company. Defendant **KIM** was also responsible for marketing the company's products to additional potential distributors abroad. He reported directly to **Chon**.

## The Conspiracy and Scheme and Artifice to Defraud

5. From in or about September 2008 and continuing thereafter until on or about November 16, 2010, in the State and District of Maryland and elsewhere, the defendant

**SHAWN CHUNSIK KIM,**

together with **Chon** and others known to the members of the United States Attorney, did knowingly and willfully combine, conspire, confederate and agree with each other and with others known to the United States Attorney to defraud the United States, for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service (IRS) of the United States Treasury Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes.

## Purpose of the Conspiracy and the Scheme and Artifice to Defraud

6. The purpose of the conspiracy and the scheme and artifice to defraud was to understate the earnings received from sales to Mirage's overseas distributors that were reflected on the company's books and records, thereby reducing the income that passed through to **Chon**'s personal tax returns and enabling **Chon** to pay substantially less in income taxes than he actually owed.

## Manner and Means of the Conspiracy and the Scheme and Artifice to Defraud

7. The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things, the following:

a. It was part of the manner and means of the conspiracy and the scheme and artifice to defraud that **Chon** caused bank accounts at Woori Bank in the Republic of Korea (South Korea) and at HSBC Bank in Hong Kong, People's Republic of China (PRC), to be established respectively in the name of Mirage's South Korean distributor and a shell corporation registered in Brunei under the name of Giant Century Holdings Limited (GCHL), were used to receive payments made on purchases of cosmetics by Mirage's foreign distributors, and these payments were not reflected on Mirage's books and records or on its tax returns.

b. It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that **Chon** directed his subordinate **KIM** to instruct many of Mirage's foreign distributors – including all of those with whom it did larger volumes of business – to send their payments to either the account at HSBC Bank or to the Bank Woori account. Among the foreign distributors who were directed to send payment to the HSBC account in Hong Kong were those in the United Kingdom, Australia, Estonia, Dubai, Kuwait, Lebanon, South Africa, Germany, and Japan. At various times, Mirage's distributors in South Korea, Australia, the United Kingdom, the PRC, and Vietnam were directed to send payments to the Hong Kong bank account.

c. It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that Mirage's foreign distributors began transferring funds by wire into the HSBC account in approximately March 2009, and continued to do so until November 2010. In all, $857,214 in payments from Mirage's foreign distributors was diverted into the GCHL account in 2009 and an additional $538,664.58 was transferred into the account in 2010 prior to November 2010.

d. It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that, at **Chon's** behest, defendant **KIM** tracked the movement of funds into the Bank Woori and HSBC accounts so that he could keep **Chon** apprised of the amount of funds received in these accounts. In compliance with instructions from **Chon**, defendant **KIM** kept the records relating to these accounts on spreadsheets that he maintained in his personal laptop computer, rather than on Mirage's main computer system.

e. It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that none of the funds transferred into the HSBC account was reported on Mirage's 2009 tax return, or reflected as pass-through income on **Chon's** own returns for 2009; nor was it **Chon's** intention to report any of the funds transferred into the HSBC account on Mirage's tax returns, or his own pass-through returns, for 2010. When the search warrant at Mirage's offices was executed in November 2010, approximately $986,000 out of the total transferred funds of $1,395,878 remained in the account.

f. It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that a substantial balance was accumulated at the account established in the name of Mirage's South Korean distributor at Woori Bank. **Chon** made repeated withdrawals from this account and expended these funds for his own purposes. None of these funds was reflected on Mirage's books and records, nor were they reported on its tax returns or taken into account in calculating the amount of income from the company that should have passed through and been reported on **Chon's** own tax returns.

g.      It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that as a result of the actions summarized above, **Chon** under-reported his taxable income by $158,292.63 in tax year 2008 and $1,008,336.17 in tax year 2009, more or less, on which amounts he would respectively have owed additional federal income taxes of $55,957 and $356,447.00, more or less.

h.      It was further a part of the manner and means of the conspiracy and the scheme and artifice to defraud that by the time the search warrant was executed by the IRS at Mirage's offices in November 2010, an additional $652,264.58, more or less, in payments from Mirage's foreign distributors had been diverted during that calendar year into the Bank Woori and HSBC accounts, which were not reflected on Mirage's books and records and which were not intended to be reported on the company's tax returns. Had these funds also not been reported on Mirage's and **Chon**'s tax returns for 2010, that would have resulted in an additional underpayment of his federal tax liability of $228,292.60, more or less, for the 2010 tax year, for a combined underpayment of $640,696.60 over all three years. **Chon** also underpaid his Maryland state taxes by a combined total of $110,245.70 in tax years 2008 and 2009, and had he failed to report the additional funds diverted in 2010 prior to the execution of the search warrant, he would have underpaid his Maryland state income taxes that year by an additional $61,638.73. That would have resulted in a combined underpayment to the federal and state tax authorities totaling $812,581.03 for the three years 2008-2010.

i.      It was further a part of the scheme and artifice to defraud that defendant **KIM** derived no personal financial benefit from taking the actions he was directed to take by **Chon**, aside from his continued employment by Mirage.

6

## **Overt Acts**

8.　　In furtherance of the conspiracy and the scheme and artifice to defraud, and to achieve the purposes thereof, at least one of the conspirators committed and caused to be committed, in the District of Maryland and elsewhere, at least one of the following overt acts, among others:

　　a.　　In or about the month of September 2008, Mirage's local marketing representative established an account (# xxxxxxxx3016) at Woori Bank in Seoul, South Korea ("the Bank Woori account").

　　b.　　On or about October 22, 2008, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

　　c.　　In or about the first half of November 2008, **Chon** caused a shell corporation to be created in Hong Kong that was registered in Brunei under the name of Giant Century Holdings Limited (GCHL).

　　d.　　On or about November 15, 2008, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

　　e.　　In or about November 21, 2008, **Chon** established an account at HSBC Bank in Hong Kong (account # xxx-xxxxx9-838) under GCHL'S name.

　　f.　　On or about December 12, 2008, acting on instructions from **Chon**, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the Bank Woori account.

　　g.　　On or about December 23, 2008, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

7

h. On or about December 24, 2008, acting on instructions from **Chon**, defendant **KIM** caused Mirage's United Kingdom distributor to transmit a wire payment to the Bank Woori account.

i. On or about December 31, 2008, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

j. On or about January 20, 2009, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the Bank Woori account.

k. On or about January 27, 2009, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the Bank Woori account.

l. On or about February 16, 2009, pursuant to instructions from **Chon**, defendant **KIM** caused Mirage's distributor in Vietnam to transmit a wire payment to the Bank Woori account.

m. In or about the first week of March, 2009, defendant **KIM** faxed instructions to Mirage's Estonian distributor directing it to change its payment account to the GCHL account at HSBC in Hong Kong.

n. On or about March 19, 2009, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

o. On or about May 6, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

p. On or about May 7, 2009, defendant **KIM** caused Mirage's distributor in Lebanon to transmit a wire payment to the GCHL account at HSBC Bank.

      q.     On or about May 30, 2009, defendant **KIM** caused Mirage's distributor in Germany to transmit a wire payment to the GCHL account at HSBC Bank.

      r.     On or about June 11, 2009, defendant **KIM** caused Mirage's distributor in Estonia to transmit a wire payment to the GCHL account at HSBC Bank.

      s.     On or about July 10, 2009, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

      t.     On or about July 10, 2009, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

      u.     On or about July 13, 2009, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the Bank Woori account.

      v.     On or about August 18, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

      w.     On or about August 20, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

      x.     On or about September 9, 2009, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

      y.     On or about September 9, 2009, **Chon** filed his joint Form 1040 federal income tax return for the year 2008, which did not truthfully reflect in Schedule E or on Line 17 the amount of his nonpassive income earned from Mirage Cosmetics.

z. On or about September 25, 2009, defendant **KIM** caused Mirage's distributor in Germany to transmit a wire payment to the GCHL account at HSBC Bank.

aa. On or about October 12, 2009, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the Bank Woori account.

bb. On or about October 13, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

cc. On or about October 20, 2009, defendant **KIM** caused Mirage's distributor in Germany to transmit a wire payment to the GCHL account at HSBC Bank.

dd. On or about October 28, 2009, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

ee. On or about November 16, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

ff. On or about January 14, 2010, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

gg. On or about February 19, 2010, defendant **KIM** caused Mirage's distributor in Estonia to transmit a wire payment to the GCHL account at HSBC Bank.

hh. On or about March 2, 2010, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

ii. On or about April 14, 2010, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the GCHL account at HSBC Bank.

jj. On or about July 14, 2010, defendant **KIM** caused Mirage's distributor in Australia to transmit a wire payment to the GCHL account at HSBC Bank.

kk. On or about August 6, 2010, defendant **KIM** caused Mirage's distributor in Estonia to transmit a wire payment to the GCHL account at HSBC Bank.

ll. On or about September 16, 2010, defendant **KIM** caused Mirage's distributor in the United Kingdom to transmit a wire payment to the GCHL account at HSBC Bank.

mm. On or about September 17, 2010, defendant **KIM** caused Mirage's distributor in South Africa to transmit a wire payment to the GCHL account at HSBC Bank.

nn. On or about October 13, 2009, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

oo. On or about July 8, 2010, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

pp. On or about October 20, 2010, **Chon** filed his joint Form 1040 federal income tax return for the year 2008, which did not truthfully reflect in Schedule E or on Line 17 the amount of his nonpassive income earned from Mirage Cosmetics.

qq. On or about November 3, 2010, Mirage's South Korean marketing representative deposited funds into the Bank Woori account.

rr. On or about November 12, 2010, **Chon** made a withdrawal of funds for his personal use from the Bank Woori account.

18 U.S.C. § 371

## COUNT TWO

### (Using a Fraudulent or Counterfeit Seal of a Federal Agency)

And the United States Attorney for the District of Maryland further charges that:

1. The allegations of paragraphs 1 through 4 of Count One are hereby realleged and incorporated herein.

2. Mirage's foreign distributors often required it to produce with its shipments an official document known as a "Certificate of Free Sales" which confirmed that the products it was selling abroad were also freely available for sale in its country of origin. Such certificates are commonly required in international commercial transactions, and the United States Food and Drug Administration (FDA), an agency of the United States Department of Health & Human Services (DHHS), provides certifications stamped with its official agency seal upon application and the payment of a small fee.

3. The cosmetics products Mirage was selling to distributors abroad were, in fact, freely sold within the United States, and Mirage could have obtained valid Certificates of Free Sale for its products from the FDA. Defendant **KIM** found, however, that it was necessary for him to apply for a Certificate of Free Sales from the FDA at least 6-8 weeks in advance of the date of shipment.

4. In order to be able to respond more expeditiously to orders from Mirage's foreign distributors, defendant **KIM** arranged to have a vendor in China produce a stamp with a counterfeit DHHS seal. Defendant **KIM** then began producing counterfeit Certificates of Free Sales, attaching ribbons and impressing the counterfeit seals on gold foil, which he provided to Mirage's foreign distributors.

5. On or about October 10, 2010, the defendant

**SHAWN CHUNSIK KIM,**

did knowingly use, affix, and impress a fraudulently made, forged, and counterfeited seal of an agency or department of the United States, to wit, the United States Department of Health and Human Services, to a document entitled "Certificate of Free Sales," which related to "Sinful Colors" products and "Wild and Crazy" Products and which purported to have been issued by Ella Toombs, M.D., Acting Director, Office of Cosmetics and Colors, Center for Food Safety and Applied Nutrition, of the United States Food and Drug Administration and the United States Department of Health and Human Services.

18 U.S.C. § 506
18 U.S.C. § 2(b)

*[signature]*
ROD J. ROSENSTEIN
UNITED STATES ATTORNEY
FOR THE DISTRICT OF MARYLAND

Date: December 13th, 2012